JEFFERSON BASSETT v. DOGOBERT MESSNER ET UX.

The case of Taylor v. Boulware, (17 Tex., 74,) defining and protecting the homestead, is affirmed. (Paschal's Dig., Note 198.)

Where a purchaser at sheriff's sale sued the husband and wife to recover the homestead; the *lis mota* was the homestead, which is not subject to administration; and, the husband having died pending the appeal in the Supreme Court, his administrator is not a necessary party.

The town of B was a hundred-acre tract of land divided into streets and squares. M bought seventeen acres, adjoining the town tract, upon which he made and improved his homestead. The subsequent incorporation of the town of B, extending its boundaries over one hundred acres, did not, and under the constitution could not, change M's homestead from a country to a town homestead. (Paschal's Dig., Const. of State, art. VII, § 22, note 198.)

Not being an inhabitant of the village, M could not be presumed to consent to the act of incorporation; and even could his tacit or actual consent be proved, it would seem that if the effect be to change the homestead, the consent of the wife must be given in the manner required by the statute. (Paschal's Dig., Art. 1003, Note 427.)

APPEAL from Washington. The case was tried before Hon. ROBERT E. B. BAYLOR, one of the district judges.

The trial was upon an agreed case, and the facts are stated in the opinion of the court.

*Sayles* & *Bassetts*, for appellant.—I. In Sossaman v. Powell, 21 Tex., 664, it was held by this court, that "as the homestead vests in the heirs with or without administration, and whether it be, or be not, set apart by the chief justice of the county court, the heirs may bring a suit in reference thereto without taking out administration on his estate." This authority conclusively determines that administration is not necessary in a suit concerning the homestead.

II. This suit was submitted to the judgment of the court below upon an "agreed case;" a reference, therefore, to the pleadings becomes unnecessary, as it must be determined in this court upon the facts shown by the agreed case. (Wilkinson v. Wilkinson, 20 Tex., 237.)

III. It is insisted by the appellant, (and upon this view of the case judgment was rendered in their favor by the court below,) that by virtue of their purchase in 1854, when their premises were not included within the limits of a town or city, they acquired such a vested interest therein as to place it out of the power of the legislature, by subsequent legislation, to change its *status*, or to attach to it the conditions appertaining to property situated within the limits of a town or city. "Vested rights," as said by the court in the case of the People v. Morris, 13 Wend., 329, "are indefinite terms, and of extensive signification, not unfrequently resorted to when no better argument exists in

cases neither within the reason nor spirit of the principle. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, where a necessity for their execution shall occur." (West River Bridge Company v. Dix, 6 How., 532.) All property derived from the state, or protected by its government, is held subject to its wants in taxation, and to certain important public uses, both in war and peace; and the owners of property hold under these conditions, which are as binding as if expressed in literal terms in the grant. (Providence Bank v. Billings & Pittman, 4 Pet., 563.) The power of legislation operates on all the persons and property belonging to the body politic. (4 Pet., 514.) Hence the government may appropriate private property for public uses by making a just compensation therefor. (Kent Com., 270; 1 Bl. Com., 139; 2 Johns. Ch., 163;) but it may, without compensation to the owner, regulate the uses of private property, so that it may not be prejudicial to the public. The right to forbid the use of property within city limits for the storing of gunpowder, to regulate the height of houses, to prohibit the sale of specified articles in certain places, to prescribe the materials that shall enter into the construction of a building, has been claimed by the legislature, and its constitutionality has never been questioned. (Vanderbilt v. Adams, 7 Cowen, 349; Stuyvesant v. The Mayor, 7 Cowen, 605; Gibbons v. Ogden, 9 Wheat., 17 and 208.) The sovereign power in a community may prescribe the manner of exercising individual rights over property. It is for the better protection and enjoyment of that absolute dominion which the individual claims. "The power rests on the implied right and duty of the supreme power to protect all by statutory regulations, so that on the whole the benefit of all is promoted. It is a power incident to every well-regulated society, and without which it could not well exist." (7 Cowen, 347.)

"In respect to public corporations, which exist only for

public purposes," says Mr. Justice Story, (in Terret v. Taylor, 9 Cranch, 43,) "such as counties, towns, cities, &c., the legislature may, under proper limitations, have a right to change, modify, enlarge, or restrain them, provided the property is secured for the use of those for whom, and at whose expense, it was originally acquired."

The power of the legislature to operate on all the property belonging to the body politic, and to pass all laws necessary and proper for the government and welfare of the people, cannot be doubted. In the case of Taylor v. Boulware, 17 Texas, 78, Judge LIPSCOMB, delivering the opinion of the court, says: "We cannot question the power of the legislature to extend the limits of the corporation of Marshall, nor to question that, after the plan or plot of the town has been extended, a homestead falling within such extension, though acquired before it was done, would work a change in the character of the homestead, from a country to a town homestead."

IV. The law which constituted the "charter" of the town authorized persons possessing the requisite qualifications, and residing within the limits of the proposed town, to vote upon the question of incorporation, (Paschal's Dig., 5251,) and the same persons are authorized to vote and hold office in the new corporation. (Paschal's Dig., 5257.) The board of aldermen are invested with legislative authority for the government of the town, (Paschal's Dig., 5262;) may pass by-laws and ordinances, impose fines, and levy taxes on persons and property, real and personal, within the town, subject to taxation by the laws of the state. Under this charter a corporation was found in existence in the town of Brenham, elections had been held, ordinances passed, by-laws made, regulations about sidewalks, markets, taxes, selling whisky, &c., established, and taxes levied and collected. It is true that the corporate authorities had not extended the plan of the town, nor sub-divided the new territory into lots and blocks, corresponding with the origi-

nal sub-divisions of the village made by the original pro-
prietor. But no section of the law required this to be
done as a condition precedent to the exercise of jurisdic-
tion over the territory, or to the creation of a town within
the defined limits.

The law declares that, upon complying with certain con-
ditions, the inhabitants of the town are incorporated within
the boundaries thereof, which shall also be designated in
the entry, (Paschal's Dig., Art. 5254;) yet we are seriously
told that territory included within these boundaries is
not a part of the town.

V. A homestead, not included in a town or city, is lim-
ited only by its quantity; if situated in a town or city, it
is determined by its value, without reference to its shape
or quantity.

In Taylor v. Boulware, it is said that "the term lot is
sufficiently comprehensive to embrace any piece or parcel
of land;" and it has been uniformly held by this court,
that the term lot, as used in that clause of the constitution
which provides for the protection of the homestead, does
not mean any particular sub-division of land, but is used
to indicate the quantity of land included in a town, appur-
tenant to a dwelling and convenient for its use. (Mathery
v. Walker, 17 Tex., 593; Pryor v. Stone, 19 Tex., 371.)

[They also reviewed Hancock v. Morgan, 17 Tex., 583,
and Mathery v. Walker, 17 Tex., 593.]

VI. It has been held, that if the property levied on is a
part of a larger quantity than the law exempts, the de-
fendant must set apart such portion as is exempted, and
claim it as such, or he will be held to have consented to
its being attached. (Nash v. Farrington, 4 Allen, 157;
Clapp v. Thomas, 5 Allen., 158.)

No brief for the appellees has been furnished to the
*Reporter*.

LINDSAY, J.—This was an "agreed case," submitted to

the judgment of the court below.   The facts are, as presented substantially in the briefs of both parties, that Messner, one of the appellees, bought $35\frac{45}{100}$ acres of land in the year 1854, adjoining what was then the village of Brenham, for the sum of $3,500; that he entered into the possession of it immediately, and, with his family, occupied it as a homestead until his death, since the rendition of the judgment upon the "agreed case" in the court below; that his surviving wife and children still occupy the premises; that the village of Brenham, at the time of Messner's purchase, embraced one hundred acres of land, donated by the proprietor, about a fourth of which was laid out by the county authorities of Washington county into streets, lots, and blocks, and the residue into five-acre lots.   In the year 1858 the village of Brenham was incorporated as a town, according to the provisions of the act of the legislature, passed on the 27th of January, 1858.   By this act of incorporation the limits of the town were extended to one square mile, having the court-house of the county for the centre.   By this extension of the original limits of the village the town boundaries took in the land of the appellees.   The premises have never been laid off into streets, blocks, and lots, and there is no street through them, and only a public road passing along by them.

In 1855 some creditor of D. Messner recovered a judgment against him in the Washington district court, which seems to have slept quietly (or at least it was not active and efficacious) till September, 1859, when execution issued.   It was levied upon the premises.   The land was sold by virtue of said execution in October of the same year, and was bought by the appellant for the sum of $65: property which it is agreed was worth $6,000.   The sale was forbidden at the time, because it was the homestead of the appellees.

The above facts, with the pleadings in the cause, were submitted to the district court, and judgment was given
xxx—39

for the appellees.    The case is now here, by appeal, for the
revision of that judgment.

We think we might safely rest this case, with the judg-
ment of the court below, upon the authority of the decision
in the case of Taylor v. Boulware, 17 Tex., 74.    It is rare
that two different cases have such striking points of paral-
lelism or similarity.    But since the rendition of the judg-
ment in the court below, and the filing of the transcript in
this court, the defendant, D. Messner, has departed this life,
and the question is raised whether the law requires that his
administrator should be made a party.    The *lis mota* in this
case is the homestead of the appellees.    From the peculiar
laws of Texas, both constitutional and statute, the admin-
istrator has nothing to do with the homestead.    The con-
stitution protects the homestead against the claims of
creditors, and the laws of administration prescribe that the
estate of the intestate descends immediately to the heirs at
law, but gives the administrator, through and by the action
of the probate court, control over the realty, only for the
purpose of paying the debts of the intestate.    The admin-
istrator of the deceased appellee is, therefore, no necessary
party in this suit.

Questions are, however, raised in this cause, as to the
effect of the act of incorporation of the town of Brenham
upon a rural homestead lying contiguous to the village,
used and enjoyed as a homestead at the time it was incor-
porated within the extended limits of the town, and as to
the liability of such homestead, thus incorporated, when it
exceeds $2,000 in value, to the payment of the demands
of creditors.  These are grave and serious questions, deeply
affecting important and sacred interests, which the govern-
ment, in the formation of its organic law, evinced its great
solicitude to shield and protect.  In securing the object con-
templated by the framers of the government, it becomes the
duty of the courts of the state to scrutinize all acts of legisla-
tion which may tend in any degree to affect or defeat the

policy inaugurated and established by the fundamental law
of the land.   It is therefore necessary to inquire into the
extent of the power of the legislature to make such delegated
grants of authority to fractional portions of the body politic
as are embraced in the act of January 27, 1858.   It is con-
ceded, without hesitancy, that the legislature could confer
authority upon the inhabitants of a village containing three
hundred souls, or a less number, to incorporate themselves
into a town in the manner in the act provided.   This right
is unquestionable.   But, as a predicate for the grant of
this authority, it is necessarily assumed that a village exists
in fact, and that it is already a town or city in embryo,
with streets and pass-ways and grounds already dedicated to
public uses by the owners of the property thus congregated
in such a community.   But it is not conceded that the legisla-
ture of the state is at liberty to give authority to three hun-
dred people, or a greater or a less number, by a vote of a
majority of them, to dedicate the property of those of them
who refuse their assent to any local municipal purposes.   If
such were the case, it would always be perilous to own a
homestead of two hundred acres in proximity to one of these
towns or villages, because the temptation to these corpora-
tions to absorb this rural homestead for purposes of taxation,
and for augmenting the local revenue, might be too strong to
be withstood, and private rights, already vested under con-
stitutional law, might be lessened, varied, and impaired, at
the caprice, the whim, or the greed of a body of individu-
als, who might accomplish what the legislature itself would
be incompetent to do.

By direct act of legislation, the legislature of this nor of
any other state, acknowledging the restraint of constitu-
tional law, forbidding the disturbance of vested private
rights, would undertake to declare as homestead, anywhere
in the country, an incorporated town or city, without the
assent of the owner, and subject it to special taxation and
burdens, in addition to the common charge incident to all

property of the state, for the fiscal purposes of the government. What it would not, and (we may say) could not do directly, without violating a cardinal principle of the government, it should not do by indirect legislation. Hence, we cannot admit that it was the purpose of the legislature to confer such extraordinary powers upon corporations organized under the authority of this act. In forming corporations, the express or implied assent of each corporator must exist to effect and bind him, so as to conclude or vary his rights of property, under the corporate powers established. Indeed, it may be said, his express assent is indispensable to change or to alter the nature of his estate in property. His duties and obligations to the corporation in which he may be situated may arise from an implied assent, and are very different things from his right of property already vested under the sovereignty and sanctions of the government; because the government itself is subjected to limitations and restrictions in its control over rights already vested by its own action and recognition. And this principle in government has its origin in the absolute necessity of the observance of good faith by governments towards their people, for the quiet, the repose, and the harmony of society. If governments could break faith with their people, there would be no obligation nor incentive for the observance of private faith between citizen and citizen in such governments.

Nothing appears in the agreed case to show that D. Messner, the head of the family, gave his express assent to the change of his rural to a suburban homestead. Possibly, this express assent, had it been given by him, might have given some color of justice to the view insisted upon by the appellant; as the husband or head of a family, who has the power of disposition of the community property, in acquiring, by his own act, a new homestead, exposes his old one to the rapacity of his creditors, if such he has. But, even in this case, it is very questionable whether it

would not require the concurrent assent of the wife, made manifest under due form of law, to change the character and nature of the homestead.

There could not be, in this case, any implied assent of the husband to the extension of the limits of the village of Brenham, the inhabitants of which were authorized, under the act, to incorporate themselves into a town; for he was not an inhabitant of the village at the time, living on the one hundred acres originally donated, and laid off into streets, lots, and blocks; and there is no circumstance upon which a presumption of that implied assent could be founded.   Hence, we conclude, that the legislature itself could not work this metamorphosis of a rural into a suburban homestead, without the consent of these peculiar words of the constitution; much less could the local municipal corporation of Brenham do so; and, certainly, we do not feel inclined, by any judicial interpretation, to achieve a result so repugnant to the letter and spirit of our domestic constitution.

The judgment is, therefore,

AFFIRMED.